Geoffrey Graber (SBN 211547)
Brian E. Johnson (*pro hac vice forthcoming*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 220025
Telephone (202) 408-4600
ggraber@cohenmilstein.com
bejohnson@cohenmilstein.com

Charles Reichmann (SBN 206699)
**LAW OFFICES OF CHARLES REICHMANN**
16 Yale Circle
Kensington, CA 94708-1015
Telephone: (415) 373-8849
Charles.reichmann@gmail.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN KUNDRATH and WILLIAM SOWELL, individually and on behalf of others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>　　vs.<br><br>FCA US LLC,<br><br>　　　　　Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

2435303 v1

Plaintiffs, individually and on behalf of all others similarly situated, hereby file suit against the Defendant listed above and allege the following:

**INTRODUCTION**

1.      Plaintiffs and class members purchased or leased new and used vehicles manufactured by FCA US LLC ("FCA") between 2014 and 2018. Each of these vehicles is equipped with the 3.6L Pentastar V6 Engine.[1]

2.      These 3.6L Pentastar V6 engines have a common defect. The engines are defective because excessive heat develops on one side of the engine; causing premature wear of component parts in the valvetrain (the "Engine Defect"). The temperatures are so high that it prevents the oil in the engine from adequately lubricating the component parts. This causes the parts to wear out prematurely and fail—often just outside the warranty period. For example, one common component that fails due to premature wear caused by the Engine Defect is the rocker arms. The rocker arms are oscillating levers that act to open and close the exhaust and intake valves in an internal combustion engine. The excessive heat caused by the Engine Defect prevents the rocker arms from being properly lubricated, which leads to premature wear and failure. When this happens an audible ticking noise develops as the rocker arms start to shift out of place—this noise is known colloquially as the "Pentastar Tick". The Engine Defect causes more than just an annoying ticking sound however; the premature failure of engine parts, including the rocker arms, can cause cylinder misfires, loss of power, and—if left unaddressed—total engine failure.

---

[1] Vehicles equipped with the 3.6L Pentastar V6 Engine (the "Subject Vehicles") include the 2014-2016 Chrysler Town & Country; 2014 Dodge Avenger; 2014-2021 Dodge Challenger; 2014-2021 Dodge Charger; 2014-2021 Dodge Durango; 2014-2021 Dodge Grand Caravan; 2014-2020 Dodge Journey; 2014-2021 Jeep Grand Cherokee; 2014-2021 Chrysler 300; 2014-2021 Jeep Wrangler; 2014-2021 Chrysler 200; 2014-2021 Ram 1500; 2014-2021 Ram Promaster; 2016- 2020 Chrysler Pacifica models.

3.      Additionally, as the component parts exposed to the heat wear down, metal shavings are circulated throughout the entire engine. Over time, serious damage to the engine can occur. Consumers face escalating repairs that can start as simply as replacing failing rocker arms to more drastic repairs such as the installation of an entirely new engine.

4.      As such, the Engine Defect endangers the drivers and passengers of vehicles equipped with the 3.6L Pentastar V6 Engine and diminishes the value of the vehicles. FCA's deliberate non-disclosure of these defects artificially inflated the purchase and lease price for these vehicles and seriously impacted their resale value.

5.      FCA has known about the excessive heat defect for years. As early as 2014, not long after the introduction of the engine, numerous purchasers of vehicles equipped with the 3.6L Pentastar V6 Engine started filing complaints with Chrysler and the National highway Traffic Safety Administration—including complaints of ticking noises, as well as cylinder head failures. This led FCA, in 2014, to issue an extended warranty on the left cylinder head on certain 2011-2013 model vehicles with the 3.6L Pentastar V6 Engine. In future models, hardened value guides and valve seats were added to better withstand the heat, but the "fix" did not address the underlying defect.

6.      Issues with the Engine Defect persisted, particularly with the rocker arms. In 2014, FCA rolled out newly designed rocker arms and instructed its dealerships to replace them for the old rocker arms if customers came in complaining of a ticking noise or were experiencing misfires. But the new rocker arms also failed to remedy the Engine Defect and complaints continue to the present.

7.      While the problem is known to FCA, the solution is not. None of FCA's suggested repairs have remedied the problem. They merely address the symptoms—the failing parts—rather than address the actual Engine Defect. But current purchasers and lessees should not have to cross

their fingers for a future fix, and prospective customers should be told of FCA's awareness of a defect. Presently, it appears FCA is merely biding time until its warranty expires—which is often when the most serious problems caused by the Engine Defect arise.

8.      FCA does not disclose the Engine Defect to purchasers or lessees like Plaintiffs at the point of purchase or through advertisements. Such disclosures would have impacted purchase decisions and purchase price. FCA's omissions artificially inflated the market price for the Subject Vehicles equipped with the defective 3.6L Pentastar V6 Engine. FCA could have and should have warned consumers about the Engine Defect through advertisements, on its website, and through communications from its authorized dealers. However, FCA failed to do so.

9.      The 3.6L Pentastar V6 Engine defect presents a safety risk to riders, causes damage to components over time, and makes vehicles equipped with the defective engine prone to total engine failure. It makes the Subject Vehicles unfit for their ordinary use, and therefore the Engine Defect presents a breach of the implied warranty of merchantability.

10.     FCA had knowledge of the Engine Defect before it sold cars equipped with 3.6L Pentastar V6 engines. As such, FCA's durational and mileage limitations on its express warranty and the implied warranty of merchantability are unconscionable.

11.     Plaintiff seeks a class on behalf of all persons in the state of California who purchased and leased a 2014 or newer FCA vehicle equipped with a 3.6L Pentastar V6 Engine. Plaintiffs bring claims under California's consumer protection statutes, and express and implied warranty law.

**PARTIES**

12.     Plaintiff John Kundrath is a citizen and resident of La Puente, California, over the age of eighteen years. Plaintiff purchased a new 2015 Jeep Grand Cherokee, manufactured by FCA and containing a 3.6L Pentastar V6 Engine, on or about August 15, 2014.

4

13.     Plaintiff William Sowell is a citizen and resident of Concord, California, over the age of eighteen years. Plaintiff purchased a new 2014 Jeep Wrangler, manufactured by FCA and containing a 3.6L Pentastar V6 Engine, on or about April 12, 2015.

14.     Defendant FCA US LLC., ("FCA") is a citizen and resident of Michigan which regularly does business in California and all over the United States. FCA is a Delaware limited liability company, and its principal office is located at 300 Renaissance Center, Detroit, Michigan 48265.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction for this case pursuant to 28 U.S.C. § 1332(d), as it is a class action for damages that exceed $5,000,000, exclusive of interest and costs. Because Plaintiffs are residents of California and are from a different state than the Defendant, who [which] is a Delaware limited liability company and headquartered in Michigan.

16.     This Court has personal jurisdiction over Defendant because it maintains numerous authorized dealers in California, and derives substantial revenue from sales of its products in California, with knowledge that its products are being marketed and sold for use in this State.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this state and this district.

## FACTUAL ALLEGATIONS

### A.     FCA and the 3.6L Pentastar V6 Engine

18.     FCA is a designer, manufacturer, marketer, and distributor of cars, trucks, and other passenger vehicles, as well as vehicle parts. FCA is the third largest American automobile manufacturer, behind only Ford and General Motors. FCA has hundreds if not thousands of official dealerships across the United States, all of which are under FCA's control. FCA sells vehicles under a variety of brand names, including Chrysler, Dodge, Jeep, Ram, and Fiat. FCA

sells approximately 2 million vehicles each year. Nearly half of these vehicles are equipped with a Pentastar V6 engine.

19.     The 3.6L Pentastar V6 Engine is an aluminum dual overhead cam 24-valve gasoline V6 engine, which features variable valve timing. The 3.6L Pentastar V6 Engine, like any engine, is an integral part of any vehicle equipped with it, converting energy from the heat of burning gasoline into mechanical work or torque. The engine itself is made up of many constituent components, which includes the rocker arms, cam shaft, and cylinder heads. Engine failure, or the failure of an engine's constituent parts, can cause serious drivability issues, including a loss in performance, misfires, and potentially, in the case of total engine failure, a complete loss of power. All of which pose serious safety issues should they occur while the vehicle is in motion.

20.     When the Pentastar V6 Engine was rolled out in 2011 it was limited to a few models, however it quickly replaced the engines of many FCA vehicles. The 3.6L Pentastar V6 Engine is now used as a one-size-fits-all engine for many of FCA's models. The 3.6L Pentastar V6 Engine, however, cannot handle the specific thermal demand placed on the engine by the various model vehicles equipped with it. Due to a design, manufacturing, and/or workmanship defect, excessive heat builds up on one side of the engine. The excessive heat caused by the Engine Defect presents itself immediately upon driving the vehicle. The heat prevents adequate lubrication and causes premature wear of the internal components of the engine. This ultimately leads to component failure.

21.     The premature wear affects various component parts of the engine, including the rocker arms. The rocker arms convert the movement of the camshaft into the opening and closing of intake and exhaust valves.

22.     As the camshaft turns, camshaft lobes push the lifters up and down. (See Figure 1).

**Figure 1**



23.     The lifters are attached to the rocker arms (See Figure 2), and as the lifters move up and down, the rocker arms rock back and forth, opening and closing intake and exhaust valves.

**Figure 2**



24.     The valves permit fuel to flow into the combustion chamber and to permit exhaust to leave it as they open and close.

25.     The opening and closing of the valves must be properly timed or else the engine will not function properly. Failure in the rocker arms and lifters can throw off this timing, causing loss of power, misfires, or—if left unaddressed—total engine failure.

26.     The heat in the 3.6L Pentastar V6 Engine causes premature wear in both the rocker arms and lifters. The Engine Defect causes the rollers in the center of the rocker arms, which the rocker arms use as a pivot point, to wear out, warp, or to otherwise dislocate the rocker arm.  The "Pentastar tick" is indicative of the rocker arm failing. The Engine Defect can cause premature wear on other components as well, such as the lifters and valves.

27.     When the Pentastar V6 Engine first launched, FCA touted it as "the most advanced V-6 engine in the company's history..."[2] Even now, though FCA has been aware of the Engine Defect for years, it continues to market its 3.6L Pentastar V6 Engine as "the most advanced six-cylinder engine in the history of FCA US, with an ideal integration of select technologies that deliver refinement, fuel efficiency and performance"—claiming that it provides "world-class performance."[3] FCA also markets the engines to consumers in its brochures as "award-winning."[4]

28.     FCA manufactured and sold, or continues to sell, several models of cars and trucks equipped with the 3.6L Pentastar V6 Engine. These include: the 2014-2016 Chrysler Town & Country; the 2014 Dodge Avenger; the 2014-2021 Dodge Challenger; the 2014-2021 Dodge

---

[2] *See* https://media.stellantisnorthamerica.com/newsrelease.do?id=9506&mid= (last accessed February 24, 2022).

[3] *See* https://media.stellantisnorthamerica.com/newsrelease.do?id=16576&mid= (last accessed February 24, 2022).

[4] *See* 2017 Dodge Journey Brochure, available at https://www.dodge.com/assets/pdf/brochure/2017MY%20Dodge%20Journey%20eBrochure.pdf (last accessed February 24, 2022).

Charger; the 2014-2021 Dodge Durango; the 2014-2021 Dodge Grand Caravan; the 2014-2020 Dodge Journey; the 2014-2021 Jeep Grand Cherokee; the 2014-2021 Chrysler 300; the 2014-2021 Jeep Wrangler; the 2014-2021 Chrysler 200; the 2014-2021 Ram 1500; the 2014-2021 Ram Promaster; and the 2016- 2020 Chrysler Pacifica models. FCA has sold hundreds of thousands of these vehicles throughout the United States.

**B.**     **Vehicles Equipped with the 3.6L Pentastar V6 Engine Came with a FCA Warranty**

29.     Each of the affected vehicles came with a Basic Limited Warranty which provides bumper-to-bumper coverage for the first 3 years or 36,000 miles, whichever comes first.

**What Is Covered under the Basic Limited Warranty**

The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation. There is no list of covered parts since the only exception are tires and Unwired headphones. You pay nothing for these repairs. These warranty repairs or adjustments — including all parts and labor connected with them — will be made by an authorized dealer at no charge, using new or remanufactured parts.

30.     In addition to the Basic Limited Warranty, FCA provides a Powertrain Limited Warranty, which covers the constituent engine parts at issue here, that lasts for 5 years or 60,000 miles, whichever comes first.[5]

31.     The Powertrain Limited Warranty covers the following engine components:

Cylinder block and all internal parts; cylinder head assemblies; timing case, timing chain, timing belt, gears and sprockets; vibration damper; oil pump; water pump and housing; intake and exhaust manifolds; flywheel with starter ring gear; core plugs; valve covers; oil pan; turbocharger housing and internal parts; turbocharger

---

[5] *See*, 2018 Jeep Warranty, available at https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Jeep/2018/Grand_Cherokee/8576.pdf (last accessed February 24, 2022).

wastegate actuator; supercharger; serpentine belt tensioner; seals and gaskets for listed components only.[6]

**C.   The 3.6L Pentastar V6 Engine Suffers from a Common Defect that Causes Unsafe Driving Conditions and Damage to the Engine.**

32.     The Subject Vehicles have an Engine Defect that endangers the drivers and passengers of the vehicles that use them. The Engine Defect causes excessive heat immediately upon operating the vehicle. While in operation, there is a recurring possibility that the Engine Defect may cause misfires, power loss, or total engine failure while on the road. This can cause the vehicle to shake, jerk, or simply stop working. All of which pose a safety concern to the driver and the vehicle's passengers if the vehicle is operating at high speeds.

33.     In addition to creating dangerous uncertainty for drivers, the Engine Defect prematurely wears out the constituent parts of the engine. This premature wear starts immediately upon operation of the vehicle. This can lead to costly repairs. Repairs can range from a few hundred dollars to replace the rocker arms to thousands of dollars should a new engine be necessary.

**D.   FCA Was Aware of the Engine Defect Through Extensive Customer Complaints on the National Highway Traffic Safety Administration Website**

34.     Besides whatever internal testing FCA likely conducted, FCA would have learned of the Engine Defect through customer complaints. These include extensive complaints on the National Highway Traffic Safety Administration ("NHTSA") website.

35.     NHTSA is the federal agency responsible for ensuring safe roadways and enforcing federal motor vehicle safety standards.[7] Consumers may file vehicle safety-related complaints through the NHTSA website, where they are logged and published. They may be sorted by make,

---

[6] *Id.*

[7] https://www.nhtsa.gov/about-nhtsa, last accessed March 7, 2022.

model, and year of vehicle. Upon information and belief, FCA personnel would review NHTSA's

website for complaints.

36.     Reviewing consumer complaints for the Subject Vehicles on the NHTSA website

yields a significant number of complaints from consumers experiencing the Engine Defect.[8] Some

examples include:

**Dodge Charger**

<u>2015 Charger</u>

A consumer from **Tampa, FL wrote on September 7, 2020**:

2 WEEKS AGO MY CAR WAS TAPPING WHEN I STARTED IT AND LAST WEEK
IT GOT LOUDER. I TOOK IT TO THE DEALERSHIP YESTERDAY AND TODAY
THEY SAID IT WAS THE CAMSHAFT: RIGHT SIDE CAMSHAFTS DAMAGE BY
WORN OUT ROCKERS AND TAPPERS. I GET MAINTENANCE ON MY CAR
WHEN I AM SUPPOSED TO. I BOUGHT MY CAR NEW. WHEN I SAID HOW I WAS
VERY DISAPPOINTED ABOUT THE CAR AND THAT I GET MAINTENANCE
DONE WHEN I SUPPOSED TO SO I DON'T SEE HOW THIS IS HAPPENING AND I
WAS TOLD IT'S NORMAL IN THOSE CARS.

A consumer from **Cottonwood, NJ wrote on March 19, 2019**:

CAR MAKES TICKING SOUND. HAD ROCKER ARM AND CAM SHAFT
REPLACED 1 YEAR AGO AND ITS TICKING AGAIN. I GET OIL CHANGES
EVERY 3000-5000 MILES.

A consumer from **Redford, MI wrote on February 1, 2018**:

THE CONTACT OWNS A 2015 DODGE CHARGER. WHILE STARTING THE
VEHICLE OR WHILE DRIVING AT UNKNOWN SPEEDS, THERE WAS AN
ABNORMAL TICKING NOISE AND THE CHECK ENGINE WARNING INDICATOR
ILLUMINATED. THE VEHICLE WAS TAKEN TO A LOCAL DEALER
(SNETHKAMP CHRYSLER DODGE JEEP RAM, 11600 TELEGRAPH RD, REDFORD
CHARTER TWP., MI 48239, (888) 455-6146) WHERE IT WAS DIAGNOSED THAT
THE CAMSHAFT WAS WORN, THE LIFTER WAS THE CAUSE OF THE TICKING
NOISE, AND THE ENGINE NEEDED TO BE REPLACED. THE VEHICLE WAS NOT
REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED. THE FAILURE
MILEAGE WAS 105,535.

2014 Charger

A consumer from **Gulfport, MS wrote on November 5, 2018:**

HEAR A TAPPING IN THE ENGINE SO I TOOK IT TO THE DEALERSHIP AND THEY TOLD ME THAT THE LIFTERS NEED TO BE REPLACED AND THAT MY WARRANTY EXPIRED 2 MONTHS AGO. THEY ALSO SAID THAT IF I KEEP DRIVING IT THE CAM SHAFT WILL BREAK AND MOTOR WILL SEIZE AND THEY ALSO TOLD ME THEY ARE HAVING A LOT OF THESE 5.7 LITER ENGINES WITH THE SAME PROBLEM.

A consumer from **Milan, TN wrote on January 20, 2014:**

MY 2014 CHALLENGER R/T HAS HAD A BAD TICKING VALVE TRAIN SINCE ABOUT NEW. THE TICKING, CLIPPING, SEWING MACHINE NOISE IS ON THE PASSENGER SIDE,IT'S LOUD AND CLEARLY HEARD IN THE CAB AT AROUND 1500RPM AND UP. STAR CASE TAB REMOVAL WAS PERFORMED, NO GOOD.NEXT LIFTERS AND MDS SOLENOIDS WAS REPLACED STILL NO GOOD. NOW ALONG WITH THE TICKING NOISE I HAVE LOUD SPARK KNOCK IN MDS MODE ON PASSENGER SIDE. HAVE BURNT OIL SMELL AFTER ATTEMPTED REPAIRS. DEALER AND DODGE REP SAYS ALL IS NORMAL. WHY WAS ALL THESE REPAIRS ATTEMPTED TO FIX MY ENGINE NOW ALL OF A SUDDEN IT'S ALL NORMAL? WHAT'S NORMAL ABOUT LOUD TICKING VALVE TRAIN THAT CAN BE HEARD IN THE CAB, LOUD SPARK KNOCK AND BURNING OIL SMELL? IT'S NOT, THEY WANT ME TO GO AWAY! WELL I'M NOT! I QUALIFY FOR LEMON LAW BUT JUST WANT MY CAR REPAIRED. ISN'T THAT WHAT A WARRANTY IS FOR? COME ON DODGE STEP UP AND REPAIR MY ENGINE! GIVE ME WHAT I PAID FOR! DON'T TREAT YOUR CUSTOMERS LIKE DIRT!

**Dodge Durango**

2014 Durango:

A consumer from **Fairfield, CT wrote on June 18, 2018:**

OUR 2017 DURANGO WITH 3000 MILES, HAD AN ENGINE LIGHT FOR OVERHEATING, QUICKLY THEREAFTER AN ENGINE LIGHT POPPED ON, TRANSMISSION LIGHT POPPED ON, ALL GAUGES THEN CEASED TO OPERATE AND THE CAR TURNED OFF AS WE WERE COASTING DOWN HILL (LUCKILY INTO SERVICE STATION). THE TRANSMISSION IS A DIAL AND THEN PUTTING IT IN NEUTRAL BECOMES AN ISSUE FOR THE TOW OR TO PUSH IT. THE ENGINE STARTING KNOCKING TERRIBLE." (pg. 2, 2017 Dodge Durango)

**Jeep Grand Cherokee**

2015 Grand Cherokee:

A consumer form **Springvale, ME wrote on February 10, 2022**

THE HYDRAULIC LIFTER IS FAILING CAUSING THE CAM SHAFT TO FAIL AND NEED TO BE REPLACED. THIS IS MAKING A TICKING NOISE AND WILL ONLY GET WORSE. CHRYSLER KNOWS THIS ISSUE EXISTS IN THE 3.6L PENTASTAR V6 ENGINES BUT WILL NOT RECALL AND FIX IT.

A consumer from **Washington, D.C. wrote on November 17, 2021:**

BAD LIFTERS AND ROCKERS ON LEFT CAMSHAFT CAUSED LOUD ENGINE TICK/KNOCK. OCCURRED AT 62000 MILES. AN APPARENT KNOWN COMMON JEEP FCA PROBLEM FOR 2015 JGC WK. HARD/ ROUGH TRANSMISSION DOWNSHIFT FROM 3RD-2ND GEAR ALONG WITH LOUD BANG NOISE. DOWNSHIFT IS SO VIOLENT IT CAUSES YOUR FOOT TO SLIP OFF THE BRAKE PEDAL WHEN BRAKING. OCCURRED AT 67000 MILES. ANOTHER KNOWN COMMON PROBLEM FOR 2015 JGC WK. THIS IS A DANGEROUS VEHICLE AND SHOULD BE RECALLED FOR THESE ISSUES BEFORE SOMEONE IS SERIOUSLY INJURED OR AN ACCIDENT RESULTS IN DEATH.

A consumer from **Blackwood, NJ wrote on July 17, 2020:**

MY 6.4 HEMI HAD A LIFTER FAILURE. IT HAS BEEN VERY WELL MAINTAIN OIL CHANGES EVERY 3/5700 MILES. 1000 MILES AGO HAD THE OIL CHANGE. AS IT GOT WARMER THE ENGINE HAD A 'TICK' NOISE. TOOK IT INTO THE DEALERSHIP TO FIND OUT A VERY COMMON LIFTER ISSUE HAS HAPPEN. I AM SHY 3 MONTHS POST WARRANTY. TEAM SRT CLAIMED IT CAN BE NORMAL MAINTENANCE FOR THE LIFTERS TO FAIL AND WIPE OUT THE CAM. THEY WILL NOT COVER IT. GOOGLE SEARCH HEMI LIFTER ISSUE. YOU'LL SEE TONS OF CASES.

A consumer form **Cleveland, OH wrote on March 3, 2020:**

HEARD TICKING COMING FROM ENGINE SHORTLY AFTER ROUTINE OIL CHANGE. BROUGHT THE CAR IN, AND WAS TOLD I HAD TO HAVE INTAKE & EXHAUST CAMSHAFT & LIFTERS REPLACED. HAD REPAIRED, A WEEK LATER CHECK ENGINE LIGHT CAME ON. GOT A P0456 CODE, BROUGHT IT IN AND AT THIS POINT THEY SAID I NEEDED TO REPLACE EVAPORATIVE PURGE VALVE. DID THAT, A WEEK LATER, CHECK ENGINE LIGHT IS ON AGAIN. NOTHING CHANGED IN THE CAR WHEN THE LIGHT GOES ON, IT JUST COME ON AND STAYS A SOLID YELLOW UPON STARTUP

**Chrysler 300**

2015 Chrysler 300:

A consumer from **Phoenix, AZ wrote on January 9, 2019:**

ENGINE CYLINDER #2 MISFIRE, I WORK AS A SEDAN DRIVER FOR A LIMOUSINE COMPANY AND I'M EXPERIENCING PROBLEMS WITH MY 2014 CHRYSLER 300, TOOK IT TO THE REPAIR SHOP BECAUSE THE CHECK ENGINE LIGHT WAS ON, THE DIAGNOSE WAS A MISFIRE ON CYLINDER #2, THE SHOP REPLACE SPARK PLUGS AND COIL PACKS, AFTER RESETTING THE CHECK ENGINE LIGHT THE MECHANIC TOOK THE CAR FOR A ROAD TEST AND THE ENGINE LIGHT CAME BACK. AFTER SCANNING THE CAR AGAIN THE SAME CODE CAME OUT FOR A MISFIRE ON CYLINDER #2. THE TESTED FUEL INJECTORS AND ENGINE COMPRESSION AND EVERYTHING WAS FINE. I WAS TOLD BY THE MECHANIC THAT THE ONLY FIX IS TO REPLACE THE HEAD CYLINDER. AFTER TALKING TO OTHER DRIVERS THAT OWN THE SAME VEHICLE AS MINE, THE TOLD ME THAT SOME OF THEM ARE HAVING THE SAME PROBLEM, AND 2 OF THEM THEY DID REPLACE THE CYLINDER HEAD ALREADY. DUE TO THE TYPE OF WORK WE DO WE PUT A LOT OF MILES ON OUR VEHICLES, SO FAR I 116,000 MILES SO I'M DEFINITELY NOT OVER UNDER WARRANTY.

**Jeep Wrangler**

2015 Jeep Wrangler:

A consumer from **Indio, CA wrote on October 19, 2021:**

I HAVE 2015 JEEP WRANGLER UNLIMITED RUBICON 1000,15 MILES ON AND IT HAS THE TICKING NOISE. I TOOK IT TO MY INDEPENDENT MECHANIC SHOP. THE INDEPENDENT MECHANIC DIAGNOSED THE ISSUE AND SAID THAT THE TICK IS COMING FROM THE PASSENGER SIDE OF THE ENGINE. I CHATTED WITH FCA TO SEE IF THEY PROVIDE ANY ASSISTANCE ON THIS ISSUE THEY DENIED EVEN IF THE VEHICLE ITS OUT OF WARRANTY THEREFORE IS HAS TO BE COVER OUT OF MY POCKET COST.

A consumer from **Scottsdale, AZ wrote on October 8, 2021:**

MY 2015 JEEP WRANGLER WITH 80,200 DEVELOPED THE WELL KNOW PENTASTAR TICK. THE JEEP WOULD MISFIRE AT IDLE WHEN SLOWING TO A STOP LIGHT. THE CHECK ENGINE LIGHT CAME ON AND THE CODE WAS A P0304. I'M THE ORIGINAL OWNER AND TOOK IT TO THE DEALER I PURCHASED IT FROM. THEY DIAGNOSED THE ISSUE AND CALLED ME STATING THAT HE JEEP NEEDS NEW ROCKERS AND A CAM SHAFT ON THE DRIVERS SIDE ENGINE BANK. FCA HAS KNOWN ABOUT THIS ISSUE SINCE 2012. I CALLED FCA TO SEE IF THEY WOULD PROVIDE ANY ASSISTANCE TO REPAIR THE JEEP. FCA REFUSED TO ACKNOWLEDGE THAT THIS ISSUE EXISTS AND REFUSES ANY ASSISTANCE FOR OWNERS EVEN SLIGHTLY OUT OF WARRANTY EVEN THOUGH IT IS A MANUFACTURING DEFECT.

A consumer from **Hollywood, FL wrote on June 13, 2021:**

I HAVE A 2015 JEEP WRANGLER WITH THE FIAT CHRYSLER'S 3.6 LITER V- 6
PENTASTAR ENGINE. THE JEEP HAS ONLY 44,465 MILES ON IT AND NOW HAS
APPARENT DESIGN AND MANUFACTURING DEFECTS ON THE ENGINE'S LEFT
SIDE , ITS THE PENTASTAR TICK. THE TICK TICK TICK IS VERY LOUD AND
THE ENGINE WILL SHUDDER, ITS ONLY A MATTER OF TIME BEFORE THE
ENGINE SHUTS OFF ON THE HIGHWAY WHEN I AM DRIVING CAUSING AN
ACCIDENT. MY DEALER HOLLYWOOD CHRYSLER JEEP ESTIMATED REPAIRS
- NEED LEFT SIDE CAMS AND FULL SET OF ROCKERS - OIL FILTER HOUSING
IS LEAKING REPLACE - REPLACE ABS SENSOR - COOLANT FLUSH - CARBON
FUEL CLEANING -FLUIDS SERVICE TOTAL $6,000.07 INVOICE # 584685. IT
LOOKS LIKE THE CYLINDER HEAD, GASKET, CAMS, LIFTERS AND ROCKERS
NEED TO BE REPLACED. CHRYSLER NEEDS TO DISCLOSE THESE DEFECTS.
YES MY JEEP IS AVAILABLE FOR INSPECTION.

A consumer from **Pacific Palisades, CA wrote on April 28, 2021:**

APOLOGIES IF THIS COMPLAINT IS A REPEAT, BUT I KEEP GETTING A
SUBMISSION ERROR NOTICE WHENEVER I TRY TO SUBMIT THIS FORM. THE
JEEP 4.0 LITER SIX CYLINDER ENGINE HAS A KNOWN DEFECT WITH
RESPECT TO THE ROCKER ARM BEARINGS THAT CAUSES A LOUD TICKING
NOISE IN THE ENGINE AND FAILURE OF THE EXHAUST AND INTAKE
CAMSHAFTS. THIS HAPPENED TO OUR 2015 JEEP IN JANUARY 2020 WHEN IT
HAD ONLY 31,000 MILES BUT WAS ONE MONTH OUT OF WARRANTY.
CHRYSLER DID FIX IT AT THAT TIME AS A COURTESY SUBJECT TO A $100
FEE, AND A COPY OF THE INVOICE FOR THAT REPAIR IS PROVIDED.
UNFORTUNATELY, A LITTLE OVER ONE YEAR LATER, AND WITH LESS THAN
10,000 MILES HAVING BEEN DRIVEN SINCE THE INITIAL REPAIR, THE SAME
PROBLEM HAS REAPPEARED. THE DEALER IS NOW CLAIMING THE PROBLEM
IS WITH THE REMAINING ROCKERS THAT WERE NOT REPLACED, AS IT IS
CHRYSLER'S POLICY TO ONLY REPLACE THE ROCKER ARMS AND
CAMSHAFTS THAT ARE DAMAGED AT THAT TIME. THE SERVICE MANAGER
AT THE DEALER SAYS THAT THEY "SEE THIS ALL THE TIME" AND THAT
THEY TRY TO GET ALL THE ROCKER ARMS REPLACED WHEN DOING ANY
REPAIRS, BUT CHRYSLER DOES NOT ALLOW THEM TO DO SO. OF COURSE,
CHRYSLER IS NOW REFUSING TO COVER THE REPAIRS, EVEN THOUGH THIS
IS A KNOWN PROBLEM AND SHOULD HAVE BEEN FIXED THE FIRST TIME.
THIS IS TOTALLY UNACCEPTABLE, AND CHRYSLER SHOULD BE FORCED TO
DO A FULL RECALL OF ALL AFFECTED ENGINES AND PAY FOR ALL
REQUIRED REPAIRS. THERE ARE THOUSANDS OF COMPLAINTS ABOUT THIS
PROBLEM ONLINE, YET CHRYSLER STILL REFUSES TO CORRECT THIS
PROBLEM.

A consumer from **Frederick, MD wrote on January 27, 2021**:

NOTICED SIGNIFICANT KNOCKING NOISE COMING FROM ENGINE THAT
CONTINUED TO GET LOUDER. TOOK TO DEALER FOR A NICE 2 THOUSAND
DOLLAR FIX. DEALER REPLACED RIGHT SIDE LIFTERS, ROCKER ARMS, AND

BOTH CAM SHAFTS. THIS SOUNDS WAY TOO MUCH LIKE THE 2011-2013 ISSUE THAT JEEP "FIXED" AND WAS UNDER WARRANTY FOR THOSE IT SOUNDS LIKE. VERY COINCIDENTAL AND I AM NOT THE ONLY ONE WITH THESE ISSUES BASED ON JEEP FORUMS

A consumer from **Winter Park, FL wrote on February 18, 2020:**

AT 41,900 MILES A NOTICEABLE CLICKING/TAPPING NOISE ANYTIME THE ENGINE ON. IT CAME ON SUDDENLY AND WHEN MECHANIC HEARD IT HE THOUGHT ROCKER ARMS OR LIFTERS HAVE FAILED . HAD DIAGNOSTIC AND MECHANIC FOUND 2 ROCKER ARMS WERE BAD . THANKFULLY CAMS WITHOUT DAMAGE PER MECHANIC LIKELY DUE TO SEEKING REPAIRS SO QUICKLY

**Ram 1500**

2018 Ram 1500:

A consumer from **Andover, OH wrote on September 24, 2021:**

THE CONTACT OWNS A 2018 RAM 1500. THE CONTACT STATED THAT AFTER STARTING THE VEHICLE, AN ABNORMAL TICKING NOISE WAS HEARD. THE VEHICLE WAS TAKEN TO AN INDEPENDENT MECHANIC AND DIAGNOSED THAT THE MANIFOLD HAD WARPED AND DAMAGED THE MANIFOLD BOLTS. THE VEHICLE WAS REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND INFORMED THE CONTACT THAT THE VEHICLE WAS OUT OF WARRANTY. THE FAILURE MILEAGE WAS APPROXIMATELY 61,174.

**E.      FCA Was Aware of the Engine Defect Through Extensive Customer Complaints on FCA-Related Websites and Online Discussion Boards**

37.      Consumers have long posted on websites dedicated to discussion of FCA vehicles regarding the Defect. One of the Defect's primary symptoms—the "Pentastar tick"—has been described as "infamous," "dreaded," and the "tick of death" by some users. Over the course of years, such FCA customers have made it clear that the Defect has been widely known of and not fixed by FCA—for example, from wranglerforum.com:

**A consumer with the username "DesertRubi" posted on November 1, 2018**:

I HAVE A 2017 WITH ONLY 10K MILES . . . BUT I DO HEAR A TICKING SOUND THAT'S NOTICEABLE STANDING NEXT TO THE JEEP . . . IT IS VERY NOTICEABLE IF YOU POP THE HOOD AND LISTEN IN NEAR THE ENGINE.

**A consumer with the username "Supercheater" posted on January 30, 2019**:

 AFTER TWO RECENT ENGINE LIGHTS ON MY JUST-OVER 57,000 [MILES] RUBICON [JEEP WRANGLER], I WAS JUST INFORMED BY [THE] DEALER THAT I ALSO NEED A NEW LEFT CYLINDER HEAD . . .[THE JEEP] LIKELY HAS THE DEFECTIVE LEFT PENTASTAR CYLINDER HEAD YOU HEAR SO MUCH ABOUT.

**A consumer with the username "NoWhiningX" posted on August 1, 2019**:

MINE DEVELOPED THE NOISE AT START UP [AND] THE DEALER HAD THE AUDACITY TO CALL IT "NORMAL" . . . I ENDED UP WITH A NEW ENGINE FROM OUTSIDE OF FCA INSTALLED BY A SHOP I TRUST.

**A consumer with the username "Gagnonc1029" posted on August 1, 2019**:

I GOT THE TICK ON MY '14 A FEW WEEKS AGO AND RECOGNIZED IT RIGHT AWAY AS LIFTER TICK EVEN BEFORE RESEARCHING THE ISSUES WITH THE PENTASTARS AND JEEPS.

**An apparent agent of Jeep ("Lydia, Jeep Social Care Specialist") replied to Gagnonc1029 on August 2, 2019:**

WE'D BE HAPPY TO ASSIST YOU WITH THIS PROCESS AND HAVE THIS PROPERLY DOCUMENTED IN OUR SYSTEM.

 **A consumer with the username "Mudman1" posted on July 27, 2020**:

I AM STARTING TO GET A SLIGHT TICK . . . '18 [JEEP WRANGLER] WITH JUST UNDER 61K MILES.

38.     Users of Allpar.com, a "forum community dedicated to Dodge, Jeep, Ram, Chrysler, and AMC owners and enthusiasts," have also long noticed the Defect—for example:

**A consumer with the username "lohchief" posted on February 26, 2013**:

CONGRATS ON THE PENTASTAR . . . NOW IF IT DOESN'T GIVE YOU THE "TICK OF DEATH" AS IT WAS APTLY NAMED ON A [JEEP WRANGLER] FORUM YOU'LL BE FINE.

**A consumer with the username "MoparNorm" posted on March 28, 2014**:

PART OF THE INFAMOUS PENTASTAR "TICK" AND SUBSEQUENT HEAD FAILURE WAS BLAMED UPON POOR QUALITY FUEL.

**A consumer with the username "TaxiGirl" posted on May 16, 2017**:

17

LAST TIME, I HAD A MECHANIC REPLACE #3 AND #5 ROCKER ARMS . . . AND LATER WHEN THE FAMILIAR TICK CAME BACK I USED MMO AND NO LONGER HAD A PROBLEM. NOW, THE TICK IS BACK WITH A VENGEANCE.

39.     Users of ChryslerMinivan.net, "the best forum for Chrysler Town and Country owners," have also long posted about the Defect:

**A consumer with the username "invader" posted on December 19, 2017**:

THE BEST ADVICE WOULD BE TO BUTTON THE INFAMOUS 3.6 BACK UP AND GET RID OF IT . . . CHASING A TICK WITH AN ALLEGED ROCKER ARM PROBLEM COULD PROVE TO BE A FUTILE NIGHTMARE.

**A consumer with the username "914rrr" posted on November 12, 2020**:

OUR 2014 [DODGE GRAND CARAVAN] HAS DEVELOPED A TICKING NOISE. FROM WHAT I'VE SEEN ONLINE, LOOKS/SOUNDS LIKE A BAD ROCKER ARM AND SEEMS TO BE A VERY COMMON PROBLEM.

40.     Users of Challenger ForumZ, "a forum community dedicated to all Dodge Challenger owners and enthusiasts," have likewise discussed the Defect:

**A consumer with the username "beas62" posted on December 23, 2013**:

I FOUND THIS [DISCUSSION ABOUT THE "PENTASTAR TICK"] WAS REALLY COMMON OVER ON THE JEEP FORUMS. SOME FOLKS HAVE HAD LIFTERS REPLACED AND SEVERAL HAVE HAD THE ENTIRE HEAD REPLACED DUE TO CONSTRICTED OIL PASSAGES. SO I BELIEVE THAT CHRYSLER KNOWS ABOUT IT BUT IT'S NOT COSTING THEM ENOUGH MONEY OR REPUTATION YET TO WORRY ABOUT.

**A consumer with the username "blazertop" posted on March 20, 2014**:

WELL, IT'S [THE "PENTASTAR TICK"] IS ALL OVER AS FAR AS CHRYSLER IS CONCERNED. THE DEALER WANTS TO FIX IT AND KEPT ESCALATING THE ISSUE BUT THEN CHRYSLER CORPORATE STEPPED IN AND TOLD THE DEALER TO STOP SERVICING THE VEHICLE FOR THIS ISSUE, AND THAT IT IS NOT AN ISSUE. ACCORDING TO THEM, THIS NOISE IS "NORMAL." . . . THE FACT IS CHRYSLER DOESN'T KNOW HOW TO FIX IT, SO THEY GAVE UP AND DECLARED IT [] "NORMAL."

**"Blazertop" expanded upon that post on June 23, 2014:**

AND IT'S REALLY OVER NOW. TOOK CHRYSLER TO "INDEPENDENT" ARBITRATION AND WON. I "WON." MY AWARD FROM THE ARBITRATOR AND CHRYSLER? I GET TO TRADE IN THE CAR. WELL, I COULD HAVE DONE THAT ANYWAY . . . I'VE GOT NOTHING EXCEPT A LOT OF WASTED TIME, WASTED MONEY, AND A CAR THAT STILL SOUNDS LIKE A DIESEL IN COLD WEATHER.

**A consumer with the username "squadco343" posted on July 29, 2019:**

HAVE THE SAME PROBLEM [THE "PENTASTAR TICK"] WITH MY 2018 RAM 1500. DECIDED TO GO THRU THE FLORIDA LEMON LAW PROCEDURES.

41.    Users of jk-forum.com, another site dedicated to Jeep Wranglers, have also commented upon the travails presented by Pentastar engines—for example:

**A consumer with the username "sefeing" posted on April 29, 2021:**

IS THIS [AUDIO] THE PENTASTAR TICK? OR AM I JUST CRAZY? 2015 WRANGLER WITH ABOUT 68,000 MILES ON IT . . . TRYING TO FIGURE OUT WHETHER THIS IS NORMAL PENTASTAR SOUND OR THE TICK.

**"Sefeing" expanded upon that post on May 14, 2021:**

WELL, UPDATE HERE—BROUGHT THE CAR IN EARLIER THIS WEEK AND SURE ENOUGH IT WAS THE TICK! THEY'RE GOING AHEAD AND REPLACING BOTH SIDES, FULL ROCKERS AND CAMS.

42.    Users of promasterforum.com, "a forum for Promaster enthusiasts," have also posted about the Defect:

**A consumer with the username "theghost1291" posted on May 1, 2020:**

I KNOW MOST OF YOU HAVE EITHER HAD THE ISSUE [THE "PENTASTAR TICK"] YOURSELF OR KNOW SOMEONE WHO HAS HAD THE INFAMOUS TICKING SOUND WITH THE PENTASTAR ENGINE. I ALSO HAD IT AND THEY REPLACED THE CAMSHAFT UNDER WARRANTY, WHAT THEY DIDN'T REPLACE OR EVEN BOTHER TELLING ME ABOUT WAS THE FACT THAT OVER TIME THE LEFT CYLINDER HEAD, OR CYLINDER 6, WOULD EVENTUALLY WEAR OUT. NOW AT 60900 MILES I HAVE ENGINE MISFIRE IN CYLINDER 6  . . . .

**In response to this post by "theghost1291," a consumer with the username "Armalite" posted on October 5, 2020:**

JUST HAD THIS HAPPEN TO ME THIS WEEK. I CALLED DODGE AND THEY SAID

1   THEY COULDN'T HELP ME.

2   **F.      FCA Was Aware of the Engine Defect Through Trade Publications**

3   43.      Trade publications have also long described the Engine Defect. For example, in

4   addressing the Pentastar's problems not long after they first became widely evident, Larry P.

5   Vellequette of *Automotive News* posted an article on autoweek.com, on August 12, 2012,

6   describing the impact and Chrysler's alleged fixing of the Engine Defect:

7

8       TO FIX THE PROBLEM, WHICH CHRYSLER EXECUTIVES DECLINED TO
        DESCRIBE FULLY, THE COMPANY DESIGNED A "MORE ROBUST" HEAD . . . AT
9       THE SAME TIME, CHRYSLER STARTED USING THE REDESIGNED HEADS ON
        NEW PENTASTARS, THE COMPANY SAID . . . CHRYSLER EXECUTIVES
10      DECLINED TO DESCRIBE FULLY THE NATURE OF THE PROBLEM OR IDENTIFY
        EXACTLY WHEN IT WAS BROUGHT TO THEIR ATTENTION. THEY SAID THEY
11      HAVE BEEN INVESTIGATING IT "FOR MONTHS" . . . POSTERS ON ALLPAR.COM
        AND CHRYSLER DEALERS CONTACTED BY *AUTOMOTIVE NEWS* SAY THE
12      CYLINDER-HEAD ISSUE ISN'T LIMITED TO PENTASTARS INSTALLED IN
        WRANGLERS.
13

14      44.      At *Auto Evolution* (autoevolution.com), Mircea Panait posted, on June 17, 2014, a

15   brief article entitled "Pentastar V6 Still Prone to Cylinder Head Failure." That article tracked FCA

16   as it continued to manage the problem that it had proclaimed solved:

17

18      FURTHERMORE, THE AUTO MANUFACTURER STILL DOESN'T WANT TO ISSUE
        AN OFFICIAL RECALL AND REPLACE THE BADLY DESIGNED CYLINDER
19      HEADS OF THE THOUSANDS OF CARS AFFECTED.

20      45.      On September 30, 2021, Nerger's Auto Express—a New Jersey-based repair

21   shop—noted on its website that one of the four most common problems with 3.6-liter, Pentastar

22   V6 engines is a "cylinder head failure [] caused by valve seats on cylinder #2 overheating."[9]

23   Another of these common problems was general "overheating."[10]

24

25

26   ───────────────

27   [9] https://www.nergersautoexpress.com/blog/four-common-problems-with-the-3-6l-pentastar-v6-
     engines-that-we-can-repair (last visited Feb. 22, 2022).

28   [10] *Id.*

**G.      FCA's Knowledge of the Engine Defect is Demonstrated by its Technical Service Bulletins**

46.      By 2012, FCA was compelled to acknowledge the Engine Defect because consumer complaints about it had become sufficiently widespread. However, FCA represented that the Defect's incidence was quite limited, confined largely, if not exclusively, to 2011-13 Jeep Wranglers.

47.      Generally, the Defect at that time was characterized by malfunctioning cylinder heads in some number of 3.6-liter, Pentastar V6 engines.

48.      In 2012, FCA made statements to the media about the nature and breadth of the Defect, or perceived defect. In the above-cited *Automotive News* article from August 2012, the author cited Bob Lee, a longtime engineering chief at Chrysler/FCA, as stating that excessive heat was *not* a causal factor as to the Defect. Mr. Lee was quoted as saying, "This one was a challenge. The good news is that it's a very small percentage of the customers and it's something we've taken care of." Chrysler's alleged fix to the issue was, as stated, a redesigned cylinder head.

49.      Mr. Lee was quoted as saying that the problem was *not* the result of a design defect. Mr. Lee was also quoted as stating, "You have to have this fuel characteristic, you have to have this drive cycle—and all of these things have to line up in order to have this situation occur. That's why the number of potentially affected engines is so small. If it were a design defect, or if it affected [a basic component] like the integrated exhaust, we'd have issues on everything, which we don't."

50.      Doug Betts, then Chrysler's senior vice president overseeing quality control, was cited as stating that the problem could be found in only about 7,500 Pentastar engines. Mr. Betts was quoted as averring that the malfunction was caused by "an interaction of a lot of rare things that ultimately come together to affect a small percentage of the population."

51.      That August 2012 article further stated, "Posters on allpar.com and Chrysler dealers

contacted by *Automotive News* say the cylinder-head issue isn't limited to Pentastars installed in Wranglers."

52.     On June 10, 2014—approximately two years after executives had expressed confidence that the Defect was extremely limited and had been solved—Chrysler Group LLC issued TSB #09-002-14 via NHTSA. That bulletin was categorized as addressing an "engine" problem, an overview of which said, "This bulletin involves checking for excessive cylinder leakage and replacing the cylinder head if necessary."

53.     That bulletin listed symptoms of the problem as being misfires on cylinders #2,4, and/or 6—i.e., the left bank of cylinders. The vehicle models covered by TSB #09-002-14 included 2011-13 Grand Cherokees, Durangos, Grand Caravans/Town & Countrys, 300s, Chargers, Challengers, 200/Avengers, Wranglers, Journeys, and 2011 Ram 1500s.

54.     On October 3, 2014, Chrysler Group LLC issued TSB #09-002-14 REV. A, thereby revising the aforementioned bulletin.

55.     TSB #09-002-14 REV. A included the same wide range of models, save for the 2011 Ram 1500. It also entailed the same overview and symptoms.

56.     On December 15, 2014, Chrysler Group LLC—one day before announcing it would be rebranded as FCA—issued TSB #09-002-14 REV. B, thereby revising TSB #09-002-14 REV. A.

57.     REV. B again acknowledged that the symptoms of the Defect, which may require replacement of cylinder heads, included the misfiring of cylinders #2,4, and/or 6—again, the left bank.

58.     TSB #09-002-14 REV. B included the same wide range of models as did REV. A. It also entailed the same overview and symptoms.

22

**H.      Despite Opportunities, FCA Failed to Inform Potential Purchasers or Lessees of the Engine Defect.**

59.      FCA has a wide variety of options for informing potential purchasers or lessees of the Engine Defect. For example, FCA has numerous websites for consumers interested in FCA-brand vehicles.  The webpages displayed when the consumer clicks on a particular type of vehicle do not inform consumers of the Engine Defect.

60.      On the home page for FCA Fleet USA, consumers can click on an "FAQ" tab. The FAQs contain no references to the Engine Defect.

61.      Websites for other brands owned by FCA, such as Chrysler, Dodge, and Jeep, do not contain any warnings to consumers or information about the Engine Defect.

62.       The websites for individual FCA-owned brands contain tabs for consumers to locate a dealer. These dealers also have information about them about the 3.6L Pentastar V6 Engine, provided to them by FCA. As detailed below, these dealers did not apprise Plaintiffs or similarly situated consumers about the Engine Defect prior to their purchase.

63.      The websites for individual FCA-owned brands also contain links to brochures about the various models.[11] These brochures specifically mention the 3.6L Pentastar V6 Engine, but the brochures do not and did not apprise Plaintiffs or similarly situated consumers about the Engine Defect.

64.      Individual FCA-owned brands, including Chrysler, Dodge, and Jeep, also have YouTube channels displaying their vehicles in action.[12] These videos provide information about vehicles equipped with the 3.6L Pentastar V6 Engine that prospective purchasers could review. The videos on the FCA-owned brand channels do not disclose any information about the Engine

---

[11] *See, e.g.,* https://www.dodge.com/gab.html (last accessed February 28, 2022).

[12] *See, e.g.,* https://www.youtube.com/user/chrysler/chrysler (last a accessed February 28, 2022).

23

Defect.

## I.     Plaintiffs' Experiences

### 1.     *John Kundrath*

65.     Plaintiff John Kundrath purchased his 2015 Jeep Grand Cherokee at an authorized Chrysler dealership in City of Industry, California—on or about August 15, 2014. At the time of his purchase, he had reviewed FCA marketing materials, and also discussed his purchase with an authorized FCA dealer.

66.     In or around October of 2021, Mr. Kundrath began experiencing issues with his Jeep Grand Cherokee. It suffered from a very rough idle, and experienced misfires in cylinder number 2. Mr. Kundrath took his vehicle in to the dealership to have the issue looked at. The dealership replaced sensors, injectors, and spark plugs, but this ultimately did not address the problem. His Jeep Grand Cherokee was still experiencing misfires on cylinder 2.

67.     In November, Mr. Kundrath took his vehicle back to the dealership a second time. This time, the dealership replaced all the rocker arms and lifters on the left side cylinder head. The repairs cost Mr. Kundrath over $2,000.00. The repairs were not covered by Mr. Kundrath's warranties.

68.     Had FCA disclosed the Engine Defect in its advertising materials, on its websites, or to its dealers, Mr. Kundrath would have learned of that material information, and would not have purchased his Jeep Grand Cherokee, or would have paid less for it.

### 2.     *Will Sowell*

69.     Plaintiff Will Sowell purchased his 2014 Jeep Wrangler at an authorized Chrysler dealership in Richmond, California—on or about April 12, 2015. At the time of his purchase, he had reviewed FCA marketing materials, and also discussed his purchase with an authorized FCA dealer.

70.     In June of 2020, Mr. Sowell began experiencing issues with his Jeep Wrangler, it started overheating.

71.      Mr. Sowell notified his dealer, who told him they would need to tear down his engine to see what was causing the issue.

72.     The dealership informed him that the left cylinder head was warped and would need a new engine. Mr. Sowell asked whether just the cylinder head could be replaced but was told a new engine was required.

73.     Mr. Sowell was told that the repairs were not covered by the warranty. Mr. Sowell was required to spend over $10,000.00 to repair his vehicle.

74.     Had FCA disclosed the Engine Defect in its advertising materials, on its websites, or to its dealers, Mr. Sowell would have learned of that material information, and would not have purchased his Jeep Wrangler, or would have paid less for it.

## CLASS ALLEGATIONS

75.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 74.

76.     Pursuant to the Fed. R. Civ. P. 23(b)(2) and (b)(3), Plaintiffs assert a state-wide class of all persons in the state of California who purchased and leased a 2014 or newer FCA vehicle equipped with a 3.6L Pentastar V6 Engine.

77.     Excluded from the Classes are the Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Classes is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

78.     This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements.

Plaintiffs seek to represent ascertainable Classes, as determining inclusion in each class can be done through the Defendant's own records, or that of Defendant's dealers.

79.     Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Classes should be expanded, divided into subclasses, or modified in any other way.

80.     Although the precise number of Class members is unknown and can only be determined through appropriate discovery, Plaintiffs believe, and on that basis allege, that the proposed Classes are so numerous that joinder of all members would be impracticable as Defendant has sold hundreds of thousands of affected vehicles nationwide during the proposed class periods.

81.     Questions of law and fact common to the Plaintiff Classes exist that predominate over questions affecting only individual members, including *inter alia*:

a.     Whether the 3.6L Pentastar V6 Engine suffers from a common defect;

b.     When Defendant knew of the Engine defect;

c.     Whether Defendant omitted material facts about the Engine Defect at the time of sale;

d.     Whether the engine can be fixed or must be replaced;

e.     Whether Defendant breached the implied warranty of merchantability by selling vehicles equipped with an engine that created unsafe driving conditions and that eroded prematurely due to the defect;

f.     Whether the Defendant's conduct was unconscionable, nullifying durational limits in the express warranties; and

g.     Whether the Defendant's conduct was purposefully or recklessly indifferent to class members purchasing or leasing vehicles equipped with 3.6L Pentastar V6 Engines.

82. Plaintiffs are members of the putative Classes. The claims asserted by the Plaintiffs in this action are typical of the claims of the members of the putative Classes, as the claims arise from the same course of conduct by the Defendant and the relief sought is common.

83. Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Classes, as their interests coincide with, and are not antagonistic to, the other Class members. Plaintiffs have retained counsel competent and experienced in both consumer protection and class action litigation.

84. Certification of the Classes are appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because questions of law or fact common to the respective members of the Classes predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications. Absent a class action it would be highly unlikely that the members of the Classes would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

85. A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create.

86. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of the class action.

87. Plaintiffs also seek class certification under Fed. R. 23(b)(2) to hold that the warranty limitation on the express and implied warranty is unconscionable in light of Defendant's

knowledge of the latent defect, and the likelihood of it to continue to manifest after the 5 year/60,000 mile limitation powertrain warranty. A class-wide ruling striking that limitation would allow class members to obtain additional relief from Defendant resulting from the Engine Defect.

**TOLLING OF THE STATUTES OF LIMITATIONS**

88.     Because the defect is undetectable through a normal visual inspection by the consumer, and FCA failed to disclose or intentionally concealed the Engine Defect, Plaintiffs and Class Members were not reasonably able to discover the problem until after purchasing the Class Vehicles, despite exercise of due diligence.

89.     Plaintiffs and the Class Members had no realistic ability to discern that the 3.6L Pentastar V6 Engine in Class Vehicles were defective. Therefore, the discovery rule is applicable to the claims asserted by Plaintiffs and the Class Members.

90.     Plaintiffs are informed and believe and based thereon allege that FCA has known of the Engine Defect since at least 2014 and has concealed from or failed to alert owners and lessees of the Class Vehicles of the defective nature of the 3.6L Pentastar V6 Engine.

91.     Any applicable statute of limitations has therefore been tolled by FCA's knowledge, active concealment, and denial of the facts alleged herein. Defendant is further estopped from relying on any statute of limitations because of its concealment of the Engine Defect.

**CAUSES OF ACTION**

**COUNT I**

**BREACH OF EXPRESS WARRANTY, CALIFORNIA COMMERCIAL CODE § 2313**

92.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 74.

93.     As an express warrantor and manufacturer and merchant, FCA had certain obligations under California Commercial Code § 2313 to conform the 3.6L Pentastar V6 Engine to the express warranties.

94.     When Plaintiffs and the members of the Class purchased and/or leased their vehicles equipped with 3.6L Pentastar V6 engines (either as new vehicles or as used vehicles with remaining warranty coverage), FCA expressly warranted under its Warranty that it would correct any vehicle defect found within the warranty period, and cover all towing, parts, and labor needed to correct the defect.

95.     The Engine Defect at issue in this litigation was present at the time vehicles equipped with the 3.6L Pentastar V6 Engine were sold and leased to Plaintiffs and members of the Class.

96.     FCA breached its express warranties (and continues to breach these express warranties) because it did not and has not corrected the Engine Defect affected vehicles equipped with the 3.6L Pentastar V6 Engine.

97.     Pursuant to its express warranties, FCA was obligated to correct any defect in the 3.6L Pentastar V6 Engine in the vehicles owned or leased by the Plaintiffs and the Class members.

98.     Although FCA was obligated to correct the defect with the 3.6L Pentastar V6 Engine, none of the purported, attempted fixes to the Engine Defect are adequate under the terms of the Warranty, as they did not cure the Defect.

99.     FCA and its agent dealers have failed and refused to conform the 3.6L Pentastar V6 Engine to the express warranties. FCA's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

100.    Plaintiffs and the members of the Class have performed each and every duty required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of FCA or by operation of law in light of FCA's conduct as described throughout this Complaint.

101.    FCA received timely notice regarding the problems from Plaintiffs when they brought their vehicles to their dealerships. FCA also received notice through complaints made by other consumers. Notwithstanding such notice, FCA has failed and refused to offer an effective remedy.

102.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by FCA to limit its express warranties in a manner that would enforce the 5 year/60,000 mile limit would be unconscionable. FCA's warranties were adhesive, and did not permit negotiation, or the inclusion of design defects. FCA possessed superior knowledge of the defects in the 3.6L Pentastar V6 Engine prior to offering the vehicles equipped with these engines for sale. FCA concealed and did not disclose this defect, and FCA did not remedy the defect prior to sale (or afterward). Any effort to otherwise limit liability for the design defect is null and void.

103.    Further, because FCA has not been able remedy the Engine Defect, the limitation on remedies included in the warranty fails its essential purpose and is null and void.

104.    Plaintiffs and the Class members have suffered damages caused by FCA's breach of its express warranties and are entitled to recover damages, including but not limited to diminution of value.

## COUNT II

### VIOLATION OF UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code - § 17200, *et seq.*

105.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 74.

106.    California Business and Professions Code § 17200, *et seq.* prohibits "any unlawful, unfair or fraudulent business act or practice."  CAL. BUS. & PROF. CODE § 17200. FCA has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of this Law.

107.    FCA has violated the unlawful prong of § 17200 by its violations of the various warranty statutes, as set forth in Paras. 1-102 and Counts I and III.

108.    FCA has violated the fraudulent prong of § 17200 because the omissions regarding the defective nature of the 3.6L Pentastar V6 Engine, as set forth in this Complaint, were likely to deceive a reasonable consumer, and the information would be material to a reasonable consumer.

109.    FCA has violated the unfair prong of § 17200 because the acts and practices set forth in the Complaint, including the manufacture and sale of the defective 3.6L Pentastar V6 Engine, FCA's failure to adequately disclose and remedy that defect, and FCA's misrepresentations regarding the defective nature of the 3.6L Pentastar V6 offend established public policy, and because the harm these acts and practices cause to consumers greatly outweighs any benefits associated with those practices. FCA's conduct has also impaired competition within the heavy duty on-highway vehicles market and has prevented Plaintiffs and the Class from making fully informed decisions about whether to purchase or lease vehicles equipped with 3.6L Pentastar V6 and/or the price to be paid to purchase or lease those vehicles.

110.    Plaintiffs have standing to pursue this claim on behalf of the Class because they have suffered an injury in fact, including the loss of money or property, as a result of and in reliance on FCA's unfair, unlawful, and deceptive practices. As set forth above regarding Plaintiffs, had FCA disclosed the defect with the 3.6L Pentastar V6 Engine prior to their purchases, they would not have purchased vehicles equipped with 3.6L Pentastar V6 Engine or not have paid as much for those vehicles. In addition, the Plaintiffs have expended money related to the Engine Defect and have suffered a diminution in value of their vehicles.

111.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of FCA's business. FCA's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated in the State of California

112.    Plaintiffs and the Class request that this Court enter such orders or judgments as may be necessary to enjoin FCA from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the Class any money FCA acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in California Business and Professions Code § 17203 and California Civil Code § 3345, and for such other relief set forth below.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

113.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 74.

114.    FCA is and was at all relevant times a merchant with respect to vehicles equipped with the 3.6L Pentastar V6 Engine. FCA directly sold and marketed vehicles equipped with the 3.6L Pentastar V6 Engine to customers through authorized dealers, like those from whom Plaintiffs and the California Class members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. FCA knew that the vehicles equipped with 3.6L Pentastar V6 Engine would and did pass unchanged from the authorized dealers to the Plaintiff and the Class members, with no modification to the engine.

115.    A warranty that vehicles equipped with the 3.6L Pentastar V6 Engine were in merchantable quality and condition is implied by law pursuant to California Commercial Code § 2314.

116.    FCA impliedly warranted that vehicles equipped with the 3.6L Pentastar V6 Engine were of good and merchantable condition and quality – fit and safe for their ordinary intended use, namely providing reliable transportation.

117.     Vehicles equipped with the 3.6L Pentastar V6 Engine were defective at the time they left the possession of FCA. FCA knew of this defect at the time these transactions occurred. Thus, vehicles equipped with the 3.6L Pentastar V6 Engine, when sold and at all times thereafter, were not in merchantable condition or quality and were not fit for their ordinary intended purpose.

118.     By virtue of the conduct described herein and throughout this Complaint, FCA breached the implied warranty of merchantability.

119.     Plaintiffs and the Class members have been damaged as a direct and proximate result of FCA's breach of the implied warranty.

120.     Plaintiffs and the Class members have performed each and every duty required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of FCA or by operation of law in light of FCA's unconscionable conduct.

121.     FCA received timely notice regarding the problems at issue in this litigation through presentation of Plaintiffs' vehicles at their dealers for repair. FCA also received noticed of breach of warranty through the numerous additional complaints as noted above, and additional comments made in online forums, to the NHTSA, to dealers, or directly to FCA. Notwithstanding such notice, FCA has failed and refused to offer an effective remedy.

122.     Plaintiffs and the Class members have had sufficient dealings with either FCA or its agents (authorized FCA repair facilities) to establish privity of contract. Notwithstanding this, privity is not required in this case because Plaintiffs and the Class members are intended third-party beneficiaries of contracts between FCA and its dealers; specifically, they are intended beneficiaries of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the 3.6L Pentastar V6 Engine and have no rights under the warranty agreements provided with vehicles equipped with the engines. The warranty agreements were designed for and intended to benefit the ultimate consumers only.

123.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, California Plaintiff and the California Class members were caused to suffer economic damage, including loss attributable to the diminished value of their vehicles equipped with 3.6L Pentastar V6 Engine, as well as the monies spent and to be spent to repair and/or replace their vehicles.

**WHEREFORE,** Plaintiffs request judgment against the Defendant for themselves and the members of the class as follows:

A.    Certification of the requested Classes pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3);

B.    Restitution of all charges paid by Plaintiffs and the Class;

C.    Disgorgement to Plaintiffs and the Class of all monies wrongfully obtained and retained by Defendant;

D.    Compensatory and actual damages in an amount according to proof at trial;

E.    Statutory damages, penalties, treble damages, as provided by law;

F.    Prejudgment interest commencing on the date of payment of the charges and continuing through the date of entry of judgment in this action;

G.    Costs and fees incurred in connection with this action, including attorney's fees, expert witness fees, and other cots as provided by law;

H.    Equitable Relief;

I.    Punitive Damages; and

J.    Grxanting such other relief as the Court deems proper.

## JURY TRIAL DEMAND

Plaintiffs hereby request a jury trial for all issues so triable.

DATED this 17th Day of March, 2022.

Respectfully submitted,

/s/ *Charles Reichmann*

Charles Reichmann

Geoffrey Graber (SBN 211547)
Brian E. Johnson (*pro hac vice forthcoming*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 220025
Telephone (202) 408-4600
ggraber@cohenmilstein.com
bejohnson@cohenmilstein.com

Charles Reichmann (SBN 206699)
**LAW OFFICES OF CHARLES REICHMANN**
16 Yale Circle
Kensington, CA 94708-1015
Telephone: (415) 373-8849
Charles.reichmann@gmail.com

*Attorneys for Plaintiffs*